**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Harry S. Smith,

        Plaintiff,

    v.

InformData, LLC f/k/a Wholesale
Screening Solutions LLC,

        Defendant.

Civil Action No. 1:25-cv-00826

**DECLARATION OF CHARLES E. HARRIS, II**

Charles E. Harris, II, declares as follows:

1.      I am a partner at Mayer Brown LLP and an attorney of record in the above matter on behalf of InformData, LLC ("InformData"). I submit this Declaration in support of InformData's Renewed Motion to Compel Arbitration or for Dismissal.

2.      Attached as Exhibit 1 is a true and correct copy of the Amended Demand for Arbitration that Plaintiff filed in *Smith v. Turn Technologies*, Case No. 01-23-0005-0001 ("the Turn Arbitration") on July 12, 2024.

3.      Attached as Exhibit 2 is a true and correct copy of the arbitrator's award in the Turn Arbitration, Dismissal Order issued on February 21, 2025.

4.      Attached as Exhibit 3 is a true and correct copy of the Terms of Use Plaintiff agreed to on March 24, 2023.

5.      Attached as Exhibit 4 is a true and correct copy of an April 19, 2023, letter submitted from Turn's counsel to Plaintiff's counsel demanding that Plaintiff voluntarily dismiss his claims.

6.      Attached as Exhibit 5 is a true and correct copy of Plaintiff's March 24, 2023, signature page agreeing to Turn's Terms of Use and authorizing Turn to conduct a Background Investigation.

7.      Attached as Exhibit 6 is a true and correct copy of the background report Turn prepared for Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 28th day of July in Chicago, Illinois.

_____/s/ Charles E. Harris, II_____

# EXHIBIT 1

HARRY SMITH,

                Claimant,

v.

TURN TECHNOLOGIES, INC.,

                Respondent.

**Case No.: 01-23-0005-0001**

**AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIMS**

Harry Smith ("Claimant" or "Mr. Smith") by and through his counsel brings the following Complaint against Turn Technologies, Inc. ("Respondent" or "Turn Technologies") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Respondent published to Claimant's potential employer, indicating that he was convicted of several felonies. However, those felony convictions had been ***pardoned and expunged*** years earlier, and Respondent's reporting of the expunged felony records, was doubly inaccurate and materially misleading.

## <u>INTRODUCTION</u>

1.      This is an individual action for damages, costs, and attorney's fees brought against Respondent pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.      Respondent is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3.      Respondent inaccurately reported to Claimant's prospective employer felony criminal records that were ***expunged*** and should not have been reported at all. Respondent's reporting is grossly inaccurate and harmful.

4.      Claimant took the necessary steps to secure expungement and there are no criminal records pertaining to Claimant that are publicly available and eligible for reporting in response to an employment application.

5.      Claimant's prospective employer denied Claimant's job application after receiving an employment background check report from Respondent, which included the criminal records despite the fact that they have been expunged.

6.      Respondent's inaccurate reporting could have easily been avoided had Respondent performed a cursory review of the widely available public court records from New Castle County, Delaware, regarding the criminal records prior to publishing Claimant's reports to his prospective employers.

7.      Had Respondent performed even a cursory review of the public court records, it would have discovered that there are no criminal records pertaining to Claimant that are publicly reported and otherwise eligible for including in an employment background report.

8.      Respondent does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Respondent's failure to employ reasonable procedures resulted in Claimant's report being grossly inaccurate.

9.      Respondent committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate criminal records information.

10. Respondent's inaccurate report jeopardized Claimant's job application on *at least* once. Respondent's inaccurate report caused GoShare to deny Claimant's application for the driving position – mind you after passing all the necessary steps.

11. As a result of Respondent's violations of the FCRA, Claimant has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12. As a result of Respondent's conduct, action, and inaction, Claimant brings claims against Respondent for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA, and for failing to conduct a reasonable reinvestigation to determine whether the information Claimant disputed – the **felony** conviction records – were inaccurate and should be corrected in the subject employment report, in violation of the FCRA, 15 U.S.C. § 1681i.

## **PARTIES**

13. Harry Smith ("Claimant" or "Mr. Smith") is a natural person residing in Bear, Delaware, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Respondent Turn Technologies, Inc. (Turn Technologies") and is an Illinois corporation doing business throughout the United States, including the State of Delaware and in this District, and has a principal place of business located at 20 W Kinzie St Ste 17 Chicago, IL,

60654. Turn Technologies can be served at its registered agent, Registered Agent Solutions Inc. located at 3000 Professional Dr. Suite A, Springfield, Illinois 62703.

15.    Among other things, Respondent sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

16.    Respondent is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## STATUTORY BACKGROUND

17.    Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

18.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

19.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

20.     Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

21.     Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Respondent prepared in Claimant's name.

22.     The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

23.     In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Respondent, are "consumer reporting agencies."  15 U.S.C. §§ 1681a(d) and (f).

24.     The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

25.     Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26.     Respondent disregarded its duties under the FCRA with respect to Claimant's background check report.

## RESPONDENT'S ILLEGAL BUSINESS PRACTICES

27.     Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data.  As a result of the increasing availability of this data, there has been a boom in the background check industry.

28.     As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening.  CFPB Report at 4.

29.     The criminal background check industry takes in revenues in excess of three billion dollars, annually.[2]

30.     Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data.  The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

31.     Background check companies, like Respondent, collect millions of criminal records from a number of sources with data from county, state, and federal level sources.  The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

32.     Given that Respondent is in the business of selling background checks, Respondent should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf  ("CFPB Report").

[2] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

33.     Respondent places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Respondent to produce reports containing information that is inaccurate and incomplete than it is for Respondent to exert proper quality control over the reports prior to their being provided to Respondent's customers.

34.     Respondent reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

35.     Respondent charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

36.     Appropriate quality control review of Claimant's report would have made clear that Respondents were reporting criminal records that were otherwise expunged and thereby defeating the very purpose of expungement.

37.     As a provider of background check reports, Respondent should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association ("PBSA").  PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS
### Claimant's Criminal Records are Pardoned and Subsequently Expunged

38.     Over a decade ago, Plaintiff was convicted of several felonies and misdemeanors, in New Castle County, Delaware.

39.     The convictions specifically occurred under Case Numbers 1310010568, 1105022121, and 0705030499, (collectively, the "Convictions").

40.     In February of 2020, Claimant appeared before the Board of Pardons seeking a pardon for the Convictions.

41.     Thereafter, the Board of Pardons recommended that a pardon be granted to Claimant based upon the progress Claimant made since his last offense and the need for a pardon for *employment purposes*

42.     Accordingly, on May 26, 2023, Governor Carney granted Claimant a Pardon of all the Convictions.

43.     Thereafter, in July 2020, Claimant applied for expungement of the Convictions.

44.     On March 3, 2021, Claimant's petition for expungement of the Convictions was granted pursuant to 11 *Del. C.* § 4372 (e) (1), which states:

> If a court issues an order expunging records, all the criminal records relating to a case specified in the order must, within 60 days of the order, be removed from the court's files and placed in the control of the Supervisor of the State Bureau of Identification or otherwise segregated and kept in a manner that ensures that they are not open to public inspection or disclosure. The court may retain a nonpublic record of expungement orders. The court shall send a copy of its order of expungement to the Bureau, and shall consult with the Bureau to develop a standard form of order for expungements. Except as otherwise provided under § 4376 of this title, the Supervisor of the Bureau shall retain control over all expunged records and shall ensure that the records or information contained in the records are not released for any reason.

45.     The expungement order further stated that Claimant need not disclose that he was arrested, charged, or convicted of the expunged Convictions, for any reason except as provided under 11 *Del. C.* §4376(a), which states:

> (1) Except for disclosure to law-enforcement officers acting in the lawful performance of their duties in investigating criminal activity or for the purpose of an employment application as an employee of a law-enforcement agency, it is unlawful for any person having or acquiring access to an expunged court or law-enforcement agency record to open or review it or to disclose to another person any information from it without an order from the court which ordered the record expunged.

> (2) In addition to such other lawful purposes as may be prescribed by law or otherwise, criminal justice agencies shall have access to the following:
> > a. Records of expunged probations before judgment and past participation in the First Offenders Controlled Substance Diversion Program, First Offenders Domestic Violence Diversion Program, or a court-supervised drug diversion program for the purpose of determining whether a person is eligible for a probation before

judgment, under § 4218 of this title; participation in the First Offenders Controlled Substance Diversion Program, under § 4767 of Title 16; participation in the First Offenders Domestic Violence Diversion Program, under § 1024 of Title 10; or participation in a court-supervised drug diversion program.

b. For criminal justice agencies involved in the licensing of individuals to carry a concealed deadly weapon under § 1441 of this title, records of expunged cases for the purpose of determining whether an individual meets the requirements to be granted a license to carry a concealed deadly weapon.

### Claimant Applies for Employment with GoShare  March 2023

46.     On or about March 13, 2023, Claimant applied for full-time employment as Delivery Professional with GoShare.

47.     Upon applying to GoShare, Claimant successfully completed the interview process.

48.     GoShare extended a job offer to Claimant.  Claimant also completed GoShare's driver's orientation.

49.     The GoShare job offer was conditioned upon Claimant passing a background check ("employment report.").

50.     On or about March 24, 2023, Claimant authorized a background check in relation to the GoShare job.

51.     Claimant was not worried about consenting to a background check report because his Convictions had been pardoned, and subsequently expunged. Furthermore, Claimant need not disclose that he was arrested, charged, or convicted of the expunged Convictions, as 11 *Del. C.* §4376(a) did not apply to the GoShare job.

### Respondent Turn Technologies Published an Inaccurate Background Check Report to GoShare March 2023

52.     GoShare contracted with Respondent Turn Technologies to conduct background checks, including criminal background checks, on its prospective employees.

53.     On or about March 24, 2023, GoShare ordered a criminal background check on Claimant from Respondent Turn Technologies.

54.     On or about March 29, 2023, in accordance with its standard procedures, Respondent Turn Technologies completed its employment report about Claimant and sold the same to GoShare.

55.     Within that employment report, Respondent Turn Technologies published inaccurate information about Claimant.

56.     Specifically, within its employment report about Claimant, Respondent Turn Technologies reported the pertinent details of the criminal records that have been expunged. Thereby, defeating the entire purpose in seeking and securing an expungement order in the first place.

57.     Specifically, Respondent Turn Technologies' employment report about Claimant included a grossly inaccurate information of felony convictions from New Castle County, Delaware, which appeared in the employment report as follows:

| Offense Description | Plea | Crime Type |
|---|---|---|
| POSSESS DRUGS WITHIN 1000 FEET OF SCHOOL | No plea entered | Felony |
| Offense Day | State | Disposition |
| Not provided | DE | GUILTY |
| Charges Filed Date | Sentence | |
| Not provided | Not provided | |

| Offense Description | Plea | Crime Type |
|---|---|---|
| POSSESS DRUGS WITHIN 1000 FEET OF SCHOOL | No plea entered | Felony |
| Offense Day | State | Disposition |
| Not provided | DE | GUILTY |
| Charges Filed Date | Sentence | |
| Not provided | Not provided | |

| Offense Description | Plea | Crime Type |
|---|---|---|
| CONSPIRACY 2ND DEGREE | No plea entered | Felony |
| Offense Day | State | Disposition |
| Not provided | DE | GUILTY |
| Charges Filed Date | Sentence | |
| Not provided | Not provided | |

| Offense Description | Plea | Crime Type |
|---|---|---|
| MAINTAIN DWELLING - DRUGS | No plea entered | Felony |
| Offense Day | State | Disposition |
| Not provided | DE | GUILTY |
| Charges Filed Date | Sentence | |
| Not provided | Not provided | |

58.    Within that employment report, Respondent Turn Technologies inaccurately published information pertaining to the expunged records from case numbers 1105022121, and 0705030499 (collectively, the "Expunged Reported Records").

59.    Respondent Turn Technologies' reporting of the criminal records, despite an expungement order, was unfair and harmful to Claimant.

60.    A cursory review of the widely available underlying public court records confirms that Claimant successfully completed the requirements necessary to have the records expunged.

61.    The expunged records should never be included in any consumer reports about Claimant and were no longer part of the public record.

62.    Alternatively, and at a minimum, Respondent should have reported that Expunged Reported Records were Pardoned, because the fact that Claimant's criminal records were ultimately pardoned changes the import and meaning of Claimant's criminal history.

63.     The sole reason the expunged records were reported as belonging to Claimant was that Respondent Turn Technologies failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the employment report it sold about Claimant to Claimant's prospective employer.

64.     Had Respondent Turn Technologies followed reasonable procedures, it would have discovered that Claimant's felony criminal records were expunged and would not have reported the same.

65.     In preparing and selling a consumer report about Claimant, wherein Respondent Turn Technologies published to Claimant's prospective employer inaccurate information about Claimant, Respondent Turn Technologies failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

66.     If not patently false, Respondent's reporting of the Expunged Reported Records is materially misleading and therefore inaccurate.

67.     Reporting the convictions, without additional context that the convictions were pardoned and/or expunged, is inaccurate because it provides a materially misleading impression of Plaintiff's convictions.

**GoShare Denies Claimant's Job Application March 2023**

68.     On or about March 29, 2023, Claimant was notified by GoShare that his employment application was denied as a direct result of Respondent Turn Technologies' inaccurate reporting of otherwise **expunged** records.

69.     In the same notification received from GoShare, Claimant was informed that he could not reply to the adverse action communication.  And further, that new applications would not be accepted, and new background checks would not be performed.

70.     Shortly thereafter, Claimant obtained a copy of the subject employment report and was shocked upon reviewing the felony conviction records contained within the subject employment report, which were previously expunged.

71.     Claimant contacted GoShare and informed them that his background check report provided by Respondent Turn Technologies was inaccurate.

72.     Claimant was very panicked, confused, and concerned about the impact of the inaccurate reporting of the expunged records, in relation to GoShare, but also the impact of the same on his future.

73.     Specifically, Respondent Turn Technologies reported felony convictions that were expunged. There were no public court records reporting the Claimant's felony convictions available to Respondent Turn Technologies prior to publishing Claimant's employment report to GoShare, but Respondent Turn Technologies failed to obtain or perform even a cursory review of such information.

**Claimant Disputed the Misinformation in Respondent Turn Technologies' Employment Report March 2023**

74.     On March 29, 2023, desperate to secure employment with GoShare and riddled with worry over the far-reaching impacts of the inaccurate information, Claimant disputed the inaccurate information with Respondent Turn Technologies. Claimant disputed via telephone and email with Respondent Turn Technologies.

75.     Claimant identified himself and provided information to Respondent Turn Technologies to support his dispute.

76.     Claimant specifically disputed the inaccurate reporting of **felony** conviction records that were expunged and should not have been reported.

77.     Claimant specifically asked Respondent Turn Technologies to investigate and correct its reporting in any employment report about Claimant.

**Respondent Turn Technologies Failed to Conduct a Reasonable Reinvestigation and Correct the Employment Report**

78.     On May 10, 2023, Claimant received Respondent Turn Technologies' response stating that it had reinvestigated Claimant's dispute and determined that its reporting was accurate and that it would not correct the subject employment report otherwise.

79.     Respondent Turn Technologies failed to issue a corrected employment report to GoShare.

80.     Despite Claimant's dispute, Respondent Turn Technologies failed to conduct a reasonable reinvestigation of Claimant's March 29, 2023, dispute and failed to correct the disputed information in violation of 15 U.S.C. § 1681i(a)(1)(A).

81.     Because Respondent Turn Technologies failed to issue a corrected employment report, GoShare never received a corrected or accurate report about Claimant.

82.     But for Respondent Turn Technologies' inaccurate employment report, Claimant's job offer would have proceeded to a hiring action, and Claimant would have been spared the humiliation, embarrassment, and stress imposed upon Claimant to correct Respondent Turn Technologies' erroneous reporting.

83.     Respondent Turn Technologies' false report cost Claimant a promising, well-paying job with GoShare.

84.     Claimant had anticipated earning between $20,000 to $35,000 per year driving for GoShare.

85.     Claimant is the breadwinner of his household and has two young children to support. He was very stressed about his ability to pay rent and provide for his family and offer them a better life.

86.     The injuries suffered by Claimant as a direct result of Respondent Turn Technologies' erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Respondent Turn Technologies' conduct would have given rise to causes of action based on defamation and invasion of privacy.

87.     As a result of Respondent Turn Technologies' violations of the FCRA, Claimant has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

88.     Claimant re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

89.     Respondent is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

90.     At all times pertinent hereto, Claimant was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

91.     At all times pertinent hereto, the above-mentioned employment report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

92.     Respondent violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment report it sold about Claimant as well as the information it published within the same.

93.     As a result of Respondent's violations of the FCRA, Claimant has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

94.     Respondent willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Claimant to recover under 15 U.S.C. § 1681o.

95.     Claimant is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Respondent in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

96.    Claimant re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

97.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

98.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

99.    On at least one occasion during 2023, Claimant disputed the inaccurate information with Respondent and requested that Respondent correct the inaccurate information in the employment report that is patently inaccurate, misleading, and highly damaging to his, namely, stating that he is a convicted felon, despite to the Expungement Order.

100.    In response to Claimant's dispute, Respondent failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the employment report and refused to correct the employment report at issue.

101.    Respondent violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to correct the disputed inaccurate information from the subject employment report; by failing to follow

reasonable procedures with which to filter and verify disputed information in Claimant's credit file; and by relying upon verification from a public source it has reason to know is unreliable.

102.    As a result of Respondent's violations of the FCRA, Claimant has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

103.    Respondent willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Claimant to recover under 15 U.S.C. § 1681o.

104.    Claimant is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Respondent in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Claimant prays for the following relief:

i.    Determining that Respondent negligently and/or willfully violated the FCRA;

ii.    Awarding Claimant actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Claimant reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

//

Respectfully submitted this 12th day of July 2024.

**GARIBIAN LAW OFFICES, P.C**.

*/s/ Jenna Dakroub*
Antranig Garibian, Esq. (DE Bar 4962)
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, DE 19803
(302) 722-6885
ag@garibianlaw.com

Jenna Dakroub, GA #385021
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerattorneys.com

David A. Chami, 027585
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-2359
F: (718) 715-1750
E: dchami@consumerattorneys.com

*Attorneys for Claimant*
*Harry Smith*

# EXHIBIT 2

**AMERICAN ARBITRATION ASSOCIATION**

In the Matter of the Arbitration between:

Case Number: 01-23-0005-0001

Harry S. Smith, Claimant          ("Claimant")
-vs-
Turn Technologies, Inc., Respondent     ("Respondent")

**DISMISSAL ORDER OF ARBITRATOR**

I, William D. Johnston, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties as of March 24, 2023, and having been duly sworn, and having fully reviewed and considered the written documents submitted to me, Claimant represented by Jenna Dakroub, Esq. and David A. Chami, Esq. of Consumer Justice Law Firm and Respondent represented by Charles E. Harris, II, Esq. and Marjan A. Batchelor, Esq. of Mayer Brown LLP, do hereby issue this Order as follows:

<u>**Background**</u>

Pending before me are the following:

1. Respondent's motion for dispositive relief, seeking dismissal in their entirety of Claimant's claims, the granting of Respondent's Counterclaim, and an award of reasonable attorneys' fees and other expenses incurred by Respondent in seeking to stay a lawsuit filed by Claimant on the ground that the matter in dispute was subject to (this later-filed) arbitration;

2. Claimant's request that I issue three subpoenas – to Wholesale Screening Services LLC, First Advantage Background Services, and the Prothonotary (Clerk) of the Delaware Superior Court; and

3. Claimant's request that the Final Hearing in this matter be postponed from its current setting of April 3-4, 2025 to sometime in August 2025 due to a competing trial in which Claimant's lead counsel is involved.

**Respondent's Dispositive Motion**

Respondent Turn Technologies, Inc. ("Turn") contends that it is entitled to judgment as a matter of law in connection with the claims asserted by Claimant Harry S. Smith ("Mr. Smith"), the Counterclaim asserted by Turn, and Turn's request for an award of attorneys' fees and other expenses incurred in seeking to stay a lawsuit filed by Mr. Smith in the United States District Court for the District of Delaware – a suit later stayed in favor of what became this arbitration as initiated by Mr. Smith.

In its motion, Turn characterizes the pending arbitration as a bad faith attempt by Mr. Smith "to extort money from Turn to buy peace." Through declarations with exhibits, Turn recounts that it is a consumer reporting agency ("CRA") under the federal Fair Credit Reporting Act (the "FCRA" or the "Act") and that it was engaged by a potential employer of Mr. Smith in March 2023 to prepare a background report for employment purposes. It further recounts that Mr. Smith agreed to Turn's "Terms" by clicking on a hyperlink and, in doing so, agreed to a limitation of liability.

According to the record before me, Turn hired Wholesale Screening Solutions LLC ("WSS") as the vendor

1

to perform a county-level search of any criminal records relating to Mr. Smith and First Advantage Background Services ("First Advantage"), another CRA, was engaged to prepare another background report for Mr. Smith, for another employment position.

According to the same record, Turn, in connection with preparation of its background report, engaged a live "court runner" to search criminal records in relevant counties; that runner obtained and reported those records to Turn after quality assurance verification; and Turn reported the results on Mr. Smith's background report, including certain felony convictions.

And, according to the record, upon receiving his background report, Mr. Smith disputed it, asserting that the convictions had been expunged. Turn then requested documentation supporting the assertion. Not having received the requested documentation, Turn terminated its reinvestigation.

Finally, according to the record, Turn learned in the course of this arbitration that Mr. Smith in fact had the information that Turn had requested and had shared that information with his counsel.

It is undisputed that, on June 13, 2023, Mr. Smith filed a Complaint against Turn and First Advantage in the United States District Court for the District of Delaware asserting essentially the same claims that have been asserted in this later-filed arbitration proceeding (the "2023 District Court Action"). The Court, as a result of a joint application, stayed the lawsuit pending the outcome of then-anticipated arbitration proceeding.

All of which, by way of Turn's motion, causes Turn to contend that each of Mr. Smith's claims of violations of the FCRA fail as a matter of law. In particular, Turn argues that Mr. Smith's claims under Sections 1681e(b) and 1681i(a) of the Act should be dismissed under controlling law because it is not a violation of the Act to report alleged expungement records. In addition, Turn argues that controlling law holds that no claim can lie against a CRA as a matter of law when the CRA reports criminal records obtained from a court's files or when the CRA relies on a reputable source of information to collect criminal records. Finally, Turn argues that Mr. Smith's claim under Section 1681i of the Act also fails as a matter of law because Turn legally terminated Mr. Smith's dispute after he failed to provide sufficient information for Turn to perform a reinvestigation.

In the alternative, Turn seeks a declaration that, if Mr. Smith's claims are not dismissed, they should be subject to a contractually agreed-upon limitation of liability ($1,000).

Turn also contends that it is entitled to judgment as matter of law on its Counterclaim because there is no genuine issue of material fact as to whether Mr. Smith breached the parties' arbitration agreement by filing the 2023 District Court Action, causing Turn to incur attorneys' fees and other expenses in challenging the suit as subject to arbitration.

Over opposition, I permitted Turn to file a Supplement to its Motion. In the Supplement, Turn urged that Mr. Smith's claims should be barred based upon estoppel due to the recent filing of another lawsuit in the United States District Court for the District of Delaware. Alternatively, Turn requested that I impose an adverse inference given what was alleged in the lawsuit.

In his Opposition, Mr. Smith contends that there are genuine issues of material fact that preclude judgment in Turn's favor, both in connection with Mr. Smith's claims and Turn's Counterclaim. In particular, Mr. Smith urges that the record demonstrates serious factual disputes regarding the reasonableness of Turn's reporting procedures and whether Turn conducted a reasonable reinvestigation. In addition, Mr. Smith challenges the enforceability of the limitation of liability provision. And, with regard to Turn's Counterclaim, he argues that there are serious factual questions as to whether the arbitration agreement between Mr. Smith and Turn should have precluded the filing of the 2023 District Court Action, including whether the agreement should have any bearing on suing First Advantage, not a party to that agreement.

In its Reply, Turn reiterates that, (i) as a matter of law, reporting an expunged record does not constitute an inaccuracy under the FCRA and (ii) the record demonstrates as a matter of law that Turn acted reasonably. In

2

addition, Turn reiterates the validity and enforceability of the limitation of liability provision, and it characterizes Mr. Smith's opposition to its Counterclaim as "no serious response."

**Discussion**

It is undisputed that Mr. Smith carries the burden of establishing the claims he has asserted under the FCRA. I am persuaded that Turn's dispositive motion has demonstrated that Mr. Smith is unable to satisfy that burden. As a result, I have no alternative but to dismiss the claims. But I do so without prejudice, respectful of the fact that the United States District Court for the District of Delaware has stayed the action before it and I do not want to presume what, if any, further action on the part of the Court may be appropriate.

Accordingly, I need not reach the parties' limitation of liability arguments.

With regard to Turn's Counterclaim, I am not persuaded that Turn is entitled to judgment as a matter of law for the reasons stated by Mr. Smith. Likewise, I am not persuaded that Turn is entitled to an award of its attorneys' fees and other expenses incurred in responding to the 2023 District Court Action since Turn was not required to "file papers to compel the court to send the case to arbitration." Under the circumstances, I find it appropriate, *sua sponte*, to grant relief to Mr. Smith in connection with dismissal of the Counterclaim (including the request for the award of fees), again without prejudice.

**Conclusion**

Accordingly, I conclude and hereby rule:

A.  Claimant's claims are **DISMISSED WITHOUT PREJUDICE**;

B.  Respondent's counterclaim is **DISMISSED WITHOUT PREJUDICE**;

C.  Claimant's requests for the issuance of subpoenas is **DENIED AS MOOT**;

D.  Claimant's request to reschedule the Final Hearing is **DENIED AS MOOT**.


**IT IS SO ORDERED.**


February 21, 2025

_____
Date

_____
William D. Johnston, Arbitrator

# EXHIBIT 3

# Terms & Conditions

TURN TECHNOLOGIES, INC.

Last updated on July 7, 2022

PLEASE READ THESE TERMS OF USE CAREFULLY, INCLUDING THE AGREEMENT TO ARBITRATE AT SECTION 14, AS THEY AFFECT YOUR LEGAL RIGHTS. BY EXPRESSLY AGREEING TO THESE TERMS OF USE OR USING SERVICES PROVIDED BY TURN TECHNOLOGIES INC., YOU AGREE TO BE BOUND CONTRACTUALLY BY THESE TERMS OF USE. IF YOU DO NOT AGREE TO THESE TERMS OF USE, YOU ARE NOT PERMITTED TO USE TURN'S SERVICES. Turn Technologies Inc. (**"Turn"**, **"we"**, **"us"**, or **"our"**) provides the content, worker screening, worker sourcing, or other products and services (**"Services"**) available, via application programming interfaces or otherwise, at www.turn.ai, through the Turn mobile application or through any other technology platforms (**"Sites"**) owned or operated by Turn. As part of the Sites and Services, Turn provides:

- (a) a platform for emerging and established companies across multiple industries who have contracted to use or test Turn's Services (**"Partners"**) to procure Consumer Reports, as defined in Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., and/or Investigative Consumer Reports as defined under the Investigative Consumer Reporting Agencies Act, California Civil Code Sections 1786 et seq. (**"consumer report"** or **"reports"**) for independent contractors, agents, volunteers, or other contingent workers (**"Workers"**, **"Consumers"**, or **"you"**) for employment purposes; and
- (b) a worker sourcing platform that allows its Partners to access a network of Workers to provide services (such platform, the **"Worker**

**Sourcing Platform"**). Workers have access to the Sites to receive and review invitations to provide services to Partners and to determine their interest in and availability to respond to such requests.

These Terms of Use (**"Terms"**) is an electronic contract that sets out the legally binding terms of the relationship between Turn and you. By accessing the Sites or Services or otherwise agreeing to the Terms, you accept and agree to be bound by the terms, conditions, and notices contained and/or referenced herein. IF YOU DO NOT AGREE TO THESE TERMS, YOU MAY NOT USE OR ACCESS OUR SITES OR SERVICES.

# Table of Contents:

- Use of the Services and Sites
- Our Intellectual Property and License to You
- Prohibited Uses of the Sites or the Services
- Your Information
- Independent Contractors
- Turn Communications
- Marketing Promotions and Referrals
- Disclaimer
- Limitation of Liability
- Indemnity
- Third-party Links
- Modification of Terms
- Dispute Resolution
- Arbitration Agreement
- General Terms
- Additional Terms

# 1. Use of the Services and Sites

## 1.1. Age

You may only use our Sites and Services if you can form a legally binding contract under applicable law. Our Services and Sites are unavailable to minors (people under the age of 18) or to those who have had an account with Turn temporarily or permanently deactivated. If you are under 13 years old, the Sites and Services are not directed to children under 13 years old, and you may not provide personal information to us or register on the Sites.

## 1.2. Creation of Account

You must register for and maintain an active personal user account to use most aspects of our Services and Sites. Account registration may require you to submit certain personal information, such as your name, email addresses, and mobile number. In return for using our Services and Sites, you agree to (i) provide true, accurate, current and complete account information, and (ii) maintain and promptly update your information to keep it true, accurate, current and complete. We have the right to block your current or future use of the Services or the Sites if you provide any information that is untrue, inaccurate, not current or incomplete, or we have reasonable grounds to suspect that the information is false, inaccurate, not current or incomplete. You may only have one account unless otherwise permitted by us in writing.

## 1.3. Account Information

You are responsible for maintaining the confidentiality and security of your account and for all activities or any other actions that occur under, or someone takes in connection with your account or password. You agree to (i) immediately notify us of any known or suspected unauthorized use of your account, or any known or suspected breach of security, including loss,

theft, or unauthorized disclosure of your password; and (ii) ensure that you exit from your account at the end of each session. Turn will not be liable for any injury, loss or damage of any kind arising from or relating to your failure to comply with (i) and (ii) or for any acts or omissions by you or someone else using your account.

## 1.4. Acceptance of Terms

These Terms apply to your use of the Services and the Sites, including but not limited to: applying for, updating, and managing your consumer report(s) and related documentation; obtaining status information regarding reports; Turn's processes for generating reports and resolving potential inaccuracies; requesting a copy of your consumer file; and/or any disputes relating to your consumer report; and seeking work opportunities with Partners seeking to provide services. Your access to, review of, and/or use of the Sites and Services is conditioned on your acceptance of and compliance with these Terms.

## 1.5. Relationship

You further acknowledge and agree that your work with Partners creates a direct business relationship between you and the Partner. Turn is not responsible or liable for the actions or inactions of a Partner or a patron of a Partner in relation to your engagement with the Partner facilitated by the Services, Sites or otherwise. You shall have the sole responsibility for any obligations or liabilities to the Partner, patrons of the Partner, or other third parties that arise from your provision of work. You acknowledge and agree that: (1) you are solely responsible for taking such precautions as may be reasonable and proper (including proper attire, and understanding the nature of the work) regarding any acts, omissions, or requirements of a Partner, a patron of a Partner, or other third party; and (2) Turn may release your

contact and/or personal information to a Partner upon reasonable request. By accepting and using the Services and Sites, you acknowledge and agree that you are an independent contractor to the Partner. You agree that nothing in these Terms should be construed to create: (a) an employer-employee relationship or (b) a joint venture, franchisor-franchisee, partnership, or agency relationship; or (3) any other relationship other than that of an independent contractor between you and the Partner.

## 1.6. Authorization to Transfer Funds

Certain Services require your authorization to initiate the transfer of funds. These fund transfers may be ACH credit or debit. You agree to authorize Turn to initiate the transfer of funds. It is your responsibility to ensure that there are sufficient funds in your bank account for the fund transfer activity initiated by Turn. If there are not sufficient funds, Turn may choose to decline or cancel the request to transfer funds. Turn is not responsible for any associated fees assessed by your bank, including, but not limited to, overdraft fees.

# 2. Our Intellectual Property and License to You

# 2.1. Reservations of Rights

Except for your Information (as defined below), Turn and its affiliates and any applicable licensors retain all intellectual property and other proprietary rights, including all patent, copyright, trade secret, trade name, trademark, and other proprietary rights, related to the Services, Sites and everything on them, from text to photos to videos to graphics and software (collectively, the **"content"**) which are protected under United States intellectual property laws and international treaty provisions. Except as otherwise indicated on the Services or the Sites and except for the trademarks, service marks, logos

and trade names of other companies we display on the Sites, all trademarks, service marks, logos, trade dress, and trade names are proprietary to Turn, including but not limited to the Turn logo; and the www.turn.ai trade dress. Turn will enforce its intellectual property rights to the fullest extent of the law. You acknowledge and agree that Turn and its affiliates and any applicable licensor's retention of contractual and intellectual property rights is an essential part of these Terms. Turn and its affiliates and any licensor (as applicable) will own and you hereby assign to Turn all rights in (i) any copy, translation, modification, adaptation or derivative work of the content, including any improvement or development thereof, whether provided as part of content or otherwise, and (ii) any suggestions, ideas, enhancement requests, feedback, or recommendations provided by or on behalf of you.

## 2.2. License to Services and Sites

We grant you a limited, non-exclusive, non-transferable and revocable license to access and use the Services and Sites for your personal use as expressly permitted by these Terms, all applicable intellectual property laws, and any Additional Terms (as defined below). Any other use of the Service or the Sites is strictly prohibited, and you may not copy, republish, upload, post, transmit, distribute or modify the Services or Sites without our express written permission. You should not interpret any language on the Sites as us granting you a license or right to use the content or third-party proprietary content without our express written permission or that of the relevant third-party owner. You also may not redistribute, sell, decompile, reverse engineer, disassemble, or otherwise reduce to a human-perceivable form any software that you download from the Sites or the Services.

## 3. Prohibited Uses of the Sites or the Services

You may not do any of the following, or allow any third party to do any of the

following: (a) copy, distribute, rent, lease, lend, sublicense or transfer the Services or the Sites, or make the Services or the Sites available to any third party, including Your affiliates, parents or subsidiaries, without Turn's express prior written consent; (b) modify, decompile, reverse engineer, or disassemble the Services or the Sites or otherwise attempt to discover any underlying source code, ideas, algorithms, file formats or programming interfaces, or create derivative works based on the Services or the Sites; (c) modify, remove, or obscure any copyright, trademark, patent or other notices or legends that appear on the Services or the Sites; (d) use the Services or the Sites to develop a competitive product offering; (e) not use, or attempt to use, the Services or the Sites for improper, illegal, or unauthorized purposes; (f) use any automated devices, such as spiders, robots or data mining techniques to download, store or otherwise reproduce, store or distribute content or to manipulate the Services or the Sites; (g) access, tamper with, or use non-public areas of the Services or the Sites, Turn's computer systems, or the technical delivery systems of Turn's affiliates; (h) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (i) forge any TCP/IP packet header or any part of the header information in any email, or in any way use the Services or the Sites to send altered, deceptive, or false source-identifying information; or (j) interfere with, or disrupt (or attempt to do so), the access of any user, host or network, including, without limitation, sending virus, overloading, flooding, spamming, mail-bombing the Services or the Sites, or using the Services or the Sites in such a manner as to interfere with or create an undue burden on the Services or the Sites.

# 4. Your Information ("Information")

## 4.1. Use of Information

Your Information is required to perform Services and provide the Sites. Your

Information also includes data from using our Sites and our Services, which may include information you provide, publish or post to or through our Services (including any account information) and our Sites or send to other users (including by in-application feedback, any email feature, or through any Turn-related social media posting). You consent to us using your Information to create an account that will allow you to access and use our Services and our Sites. Our collection and use of your Information is as provided in our Privacy Policy located at turn.ai/privacy.

## 4.2. License to Information

IN CONSIDERATION OF YOUR USE OF TURN'S SERVICES AND SITES YOU GRANT TURN A NON-EXCLUSIVE, WORLDWIDE, PERPETUAL, IRREVOCABLE, ROYALTY-FREE, TRANSFERABLE, SUB-LICENSABLE (THROUGH MULTIPLE TIERS) RIGHT AND LICENSE TO EXERCISE THE COPYRIGHT, PUBLICITY, AND DATABASE RIGHTS YOU HAVE IN YOUR INFORMATION, AND TO USE, COPY, PERFORM, DISPLAY AND DISTRIBUTE SUCH INFORMATION TO PREPARE DERIVATIVE WORKS, OR INCORPORATE INTO OTHER WORKS, OR INTO ANY MEDIA NOW KNOWN OR NOT CURRENTLY KNOWN.

## 4.3. Ownership of Information

Turn does not assert any ownership rights over your Information; rather, as between you and Turn, you retain full ownership of all of your Information and any intellectual property rights or other rights associated with your Information.

## 4.4. Background Checks

Partners may invite you to submit a background check application to Turn for

the purpose of procuring a consumer report for employment purposes. By submitting a background check application with Turn, you agree to create a Worker profile in the Worker Sourcing Platform. You may direct Turn to connect with Partners on their behalf to be considered by Partners to provide services. Workers have access to the Sites to receive and review invitations to provide services to Partners and to determine their interest in and availability to respond to such requests. Partners may also invite you to be screened as a precondition to provide services. Only with your consent will your information be shared with Partners.

# 5. Independent Contractors

The Worker Sourcing Platform provides an on-demand service that allows Partners to connect with Turn's network of geographically distributed independent contractors. You understand and agree that: (i) you are not an employee of Turn; (ii) Turn is not required to provide you with workers' compensation insurance or other similar insurance coverage; and (iii) Turn does not, in any way, supervise, direct, or control services contracted by and between you and our Partners. Nothing in these Terms is intended to create any employment contractual relationship by and between you and Turn. Partner is the sole contracting party. In no event shall Turn be interpreted to be acting as your agent and/or attorney in fact.

# 6. Turn Communications

# 6.1. Generally

(a) Subject to Section 15.10(a), as consideration for using our Services and the Sites, you consent to receive communications from us, including via email, text, facsimile, voice and push notifications, to keep you informed about the Services and Sites. You expressly consent to receive text

messages, faxes, telephone calls or prerecorded messages generated by automatic telephone dialing systems or other technologies. SMS text messages are for informational purposes only. While messages and notifications are intended to enhance your use of the Services and Sites, you may (1) disable push notifications on your device, and/or (2) reply **"STOP"** to remove yourself from our text message database. Depending on your current carrier plan, you may incur charges for these messages and notifications and agree to not hold Turn liable for any charges incurred. You acknowledge that any terms between you and any third-party provider create no obligation or responsibility on the part of Turn, and that Turn is not responsible for any failure of warranty by any such third party. Turn cannot control certain factors relating to message delivery. You acknowledge that, depending on your mobile carrier's service, it may not be possible to transmit a text message to you successfully. We have no liability for transmission delays or message failures. (b) IF YOU WISH TO OPT OUT OF PROMOTIONAL EMAILS, CALLS, OR TEXTS TO YOUR MOBILE DEVICE OR DESKTOP COMPUTER, YOU CAN UNSUBSCRIBE BY FOLLOWING THE UNSUBSCRIBE OPTIONS IN THE EMAIL ITSELF. YOU ACKNOWLEDGE THAT YOU ARE NOT REQUIRED TO CONSENT TO RECEIVE PROMOTIONAL EMAILS, TEXTS, OR CALLS AS A CONDITION OF USING THE SITE OR OUR SERVICES. IF YOU WANT TO OPT OUT OF ALL PROMOTIONAL EMAILS, TEXTS, OR CALLS TO YOUR MOBILE DEVICE OR DESKTOP COMPUTER (INCLUDING OPERATIONAL OR TRANSACTIONAL EMAILS, TEXTS, OR CALLS), YOU CAN UNSUBSCRIBE ENTIRELY OR SUSPEND YOUR ACCOUNT.

## 6.2. Turn AI Short Code Terms of Service.

(a) The Turn AI Short code Program is a program that will send notifications, status updates, and chat and marketing messages to individuals who have

given consent to receive each type of messages. **(b) You can cancel the SMS service at any time. Just text "STOP" to the short code. After you send the SMS message "STOP" to us, we will send you an SMS message to confirm that you have been unsubscribed. After this, you will no longer receive SMS messages from us. If you want to join again, just sign up as you did the first time, and we will start sending SMS messages to you again.** (c) If you are experiencing issues with the messaging program, you can reply with the keyword HELP for more assistance, or you can get help directly at support@turn.ai or +1 (888) 499-8876. (d) Carriers are not liable for delayed or undelivered messages. (e) Message and data rates may apply. Message frequency varies. If you have any questions about your text plan or data plan, it is best to contact your wireless provider. (f) If you have any questions regarding privacy, please read our privacy policy: turn.ai/privacy..

## 6.3. Turn Screen Short Code Terms of Service.

(a) The Turn AI Short code Program is a program that will send notifications, status updates, and chat messages to individuals who have given consent to receive each type of messages. **(b) You can cancel the SMS service at any time. Just text "STOP" to the short code. After you send the SMS message "STOP" to us, we will send you an SMS message to confirm that you have been unsubscribed. After this, you will no longer receive SMS messages from us. If you want to join again, just sign up as you did the first time, and we will start sending SMS messages to you again.** (c) If you are experiencing issues with the messaging program, you can reply with the keyword HELP for more assistance, or you can get help directly at support@turn.ai or +1 (888) 499-8876. (d) Carriers are not liable for delayed or undelivered messages. (e) Message and data rates may apply. Message frequency varies. If you have any questions about your text plan or

data plan, it is best to contact your wireless provider. (f) If you have any questions regarding privacy, please read our privacy policy: turn.ai/privacy..

# 7. Marketing Promotions and Referrals

(a) Turn may, in its sole discretion, offer first- or third-party promotions on or through our Services, Sites or communications. We reserve the right to withhold or deduct benefits you may obtain through any such promotion if we determine or believe that the redemption of the promotion or receipt of the credit or benefit was in error, fraudulent, illegal, or in violation of the applicable promotional terms or these Terms. (b) We may, from time to time, offer you incentives to refer new users to us. These incentives may come in many forms, and we may set or change the incentive types, amounts, terms, restrictions, and qualification requirements for any incentives in our sole discretion. Your participation in any referral program is subject to these Terms and any additional referral program rules. (c) Turn may allow access to or make available opportunities for you to view certain content and receive other products, services and/or other materials based on your location. To make these opportunities available to you, Turn may determine your location using one or more reference points, such as GPS, Bluetooth and/or software within your mobile device. If you have set your mobile device to disable GPS, Bluetooth or other location determining software or do not authorize Turn to access your location data, you will not be able to access such location-specific content, products, services and materials. For more about how the Turn uses and retains your information, please read our Privacy Policy at turn.ai/privacy..

# 8. DISCLAIMER

(a) THE SITES, SERVICES AND ALL OTHER CONTENT ON OUR SERVICES OR SITES ARE PROVIDED **"AS IS" AND "AS AVAILABLE."** TURN

DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS,
IMPLIED, OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS,
INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS
FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. ALSO, WE MAKE
NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE
RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF
OUR SERVICES, SITES OR ANY SERVICES REQUESTED THROUGH THE USE
OF OUR SERVICES OR SITES, OR THAT OUR SERVICES OR SITES WILL BE
UNINTERRUPTED OR ERROR-FREE. TURN DOES NOT GUARANTEE THE
QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD PARTIES. YOU
AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SITES,
OUR SERVICES, AND ANY SERVICE REQUESTED IN CONNECTION WITH
YOUR USE OF OUR SERVICES OR SITES, REMAINS SOLELY WITH YOU, TO
THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW. (b)
UNLESS OTHERWISE PROVIDED IN WRITING, THE CONTENT ON THE
SERVICE IS STRICTLY FOR INFORMATIONAL PURPOSES. YOU AND OUR
PARTNERS MAKE ANY DECISION TO ACCEPT OR OFFER CONTINGENT
WORK. NO INDEPENDENT CONTRACTOR, EMPLOYER-EMPLOYEE, JOINT
VENTURE, PARTNERSHIP, OR AGENCY RELATIONSHIP EXISTS BETWEEN
AND AMONG YOU, TURN, OR OUR PARTNERS AS A RESULT OF THESE
TERMS OR YOUR USE OF OUR SERVICES OR SITES.

# 9. LIMITATION OF LIABILITY

## 9.1. INDIRECT DAMAGES; LIABILITY CAP

TO THE MAXIMUM EXTENT PERMITTED BY LAW, TURN NOR ITS
AFFILIATES SHALL NOT BE LIABLE TO YOU FOR ANY INDIRECT, SPECIAL,
INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS
OR DAMAGES WHATSOEVER (EVEN IF YOU PREVIOUSLY ADVISED OF THE
POSSIBILITY OF SUCH DAMAGES) ARISING OUT OF OR RELATING TO

THESE TERMS OR THE USE, INABILITY TO USE, PERFORMANCE OF, OR
SERVICES PROVIDED ON OR THROUGH THE SITES, HOWEVER CAUSED
AND UNDER WHATEVER CAUSE OF ACTION OR THEORY OF LIABILITY
BROUGHT (INCLUDING UNDER ANY CONTRACT, NEGLIGENCE, OR OTHER
TORT THEORY OF LIABILITY). WE ASSUME NO RESPONSIBILITY AND
SHALL NOT BE LIABLE FOR ANY DAMAGES TO, OR VIRUSES THAT MAY
INFECT YOUR COMPUTER EQUIPMENT OR OTHER PROPERTY AS A
RESULT OF YOUR ACCESS TO, USE OF, BROWSING OF, OR DOWNLOAD OF
ANY MATERIALS FROM THE SITES. WE ALSO ASSUME NO
RESPONSIBILITY OR LIABILITY IN ANY MANNER ARISING OUT OF OR
RELATING TO ANY INFORMATION, CONTENT, PRODUCTS, SERVICES, OR
MATERIAL AVAILABLE ON OR THROUGH THE SITES, AS WELL AS ANY
THIRD-PARTY WEBPAGES OR ADDITIONAL WEBSITES LINKED TO THE
SITES, FOR ANY ERROR, DEFAMATION, LIBEL, SLANDER, OMISSION,
FALSEHOOD, OBSCENITY, PORNOGRAPHY, PROFANITY, DANGER, OR
INACCURACY CONTAINED ON THE SITES OR HARM TO ANY PERSON OR
PROPERTY CAUSED BY YOUR USE OF THE SITES. THESE LIMITATIONS
SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE
OF ANY LIMITED REMEDY. TO THE MAXIMUM EXTENT PERMITTED BY
LAW, IN NO EVENT SHALL OUR TOTAL LIABILITY TO YOU FOR ALL
DAMAGES, LOSSES, AND CAUSES OF ACTION, WHETHER IN WARRANTY,
CONTRACT, OR NEGLIGENCE EXCEED $1,000. YOU AND TURN AGREE
THAT THE WARRANTY DISCLAIMERS, AND LIMITATIONS OF LIABILITY IN
THESE TERMS ARE MATERIAL, BARGAINED-FOR BASES FOR THESE
TERMS, AND THAT YOU AND TURN TOOK THEM INTO ACCOUNT IN
DETERMINING THE CONSIDERATION TO BE GIVEN UNDER THESE TERMS
AND IN THE DECISION BY YOU AND TURN TO ENTER INTO THESE TERMS.
YOU AND TURN AGREE THAT THE WARRANTY DISCLAIMERS, AND
LIMITATIONS OF LIABILITY IN THESE TERMS OF USE ARE FAIR AND
REASONABLE.

## 9.2. EXCLUSIVE REMEDY

YOUR SOLE AND EXCLUSIVE REMEDY IF YOU ARE NOT SATISFIED WITH THE SITES OR OUR SERVICES, OR YOU DO NOT AGREE TO THE TERMS OF THESE DISCLAIMERS IS TO DISCONTINUE USING THE SITES OR OUR SERVICES, EXCEPT AS PROVIDED IN THIS SECTION.

# 10. Indemnity

You agree to indemnify, defend and hold Turn and its affiliates and our officers, directors, employees, and agents harmless from any and all claims, demands, losses, liabilities, and expenses (including attorneys' fees), arising out of or in connection with (i) your use of our Sites or as a result of your use of our Services; (ii) your breach or violation of any of the terms of These terms; (iii) Turn's use of your Information; or (iv) your violation of the rights of any third party, including the rights of our Partners.

# 11. Third-Party Links

# 11.1. Third-Party Websites

The Sites may contain links to websites that third parties own, control, develop, sponsor or maintain and that may be subject to additional terms and conditions (**"Third-Party Websites"**). Turn does not review, monitor, operate or control the Third-Party Websites, and it makes no guarantees, representations or warranties as to, and shall have no liability for, the content available on or through or the functioning of the Third-Party Websites. By providing access to Third-Party Websites, we are not recommending or otherwise endorsing the products or services provided by the sponsors or owners of the Third-Party Websites. Your access or use of the Third-Party Websites, including providing information, materials or other content to the

Third-Party Websites, is entirely at your own risk. Turn has the right to discontinue links to any Third-Party Websites at any time and for any reason, without notice.

## 11.2. SNS Accounts

You may be able to create or log-in to your Turn account through social networking accounts (each such account, an **"SNS account"**). You understand by connecting to Turn through an SNS account that we may access or store any SNS account content, or make it available to you or others, according to the permission settings of your SNS account (e.g., friends, mutual friends, contacts or following or followed lists (the **"SNS content"**)). You understand that SNS content may be available on and through the Sites or our Services. By using the Services or the Sites, you agree to comply with any applicable terms, conditions or requirements promulgated by any SNS provider.

# 12. Modification of Terms

## 12.1. Changes to the Terms

We may change these Terms from time to time and without prior notice. Any such modification will be effective as soon as we post it, and we will always post the most current version of these Terms. We may notify you if we make a change that we, in our sole discretion, deem material; you agree, however, that you will review these Terms periodically for any change. By continuing to use our Services or Sites after we post updated Terms at www.turn.ai , you agree, except as provided in the arbitration agreement, to be bound by the updated Terms, and that, if you do not assent to the updated Terms, you will stop using our Services or Sites.

## 12.2. Additional Terms

We may also post or link additional terms, policies, rules or guidelines applicable to our Services, Sites, or certain features, such as end-user license agreements, or other agreements or rules applicable to particular features, promotions or content on the Services or the Sites (collectively, the **"Additional Terms"**). Your use of our Services and Sites is subject to any Additional Terms, and those terms are incorporated into these by reference.

## 13. Dispute Resolution

Turn encourages you to contact us at support@turn.ai if you have concerns or complaints about the Services, Sites or Turn. Generally, complaints can be satisfactorily resolved in this way. In the unlikely event that you are not able to resolve your concerns informally, you and Turn each agree to resolve all disputes through binding arbitration or a small claims court rather than lawsuits in courts of general jurisdiction, jury trials, or class actions. Arbitration is more informal than a lawsuit. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to limited review by courts. Arbitrators can award the same damages and individual relief affecting individual parties that a court can award, including an award of attorneys' fees if the law allows. In addition, under certain circumstances (as explained below), Turn will pay you more than the amount of the arbitrator's award if the arbitrator awards you an amount that is greater than what Turn has offered you to settle the dispute.

## 14. Arbitration Agreement

## 14.1. Claims Subject to Arbitration

(a) You and Turn agree to arbitrate all disputes and claims between us that arise out of, relate to, or are associated with the Services, the Sites or Turn. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to, all claims arising out of or relating to any aspect of our relationship, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory, that arose either before or during this or any prior agreement, or that may arise after termination of these Terms, including claims over marketing or communications by or on behalf of Turn or claims involving the security, transfer, or use of data about you. It also includes claims that currently are the subject of class action or purported class action litigation in which you are not a member of a certified class. References to **"Turn"**, **"you"**, and **"us"** include our respective predecessors in interest, successors, and assigns, as well as our respective past, present, and future subsidiaries, affiliates, agents, employees, and all authorized or unauthorized users or beneficiaries of Services or Sites under this or prior agreements between us. (b) Notwithstanding the foregoing agreement, Turn agrees that it will not use arbitration to initiate debt collection against you except in response to claims you have made in arbitration. In addition, by agreeing to resolve disputes through arbitration, you and Turn each agree to unconditionally waive the right to a trial by jury or to participate in a class action, representative proceeding, or private attorney general action. Instead of arbitration, either party may bring an individual action seeking only individualized relief in a small claims court for disputes or claims that are within the scope of the small claims court's authority, so long as the action remains in that court and is not removed or appealed to a court of general jurisdiction. (If these limitations on removal or appeal of small claims court actions are unenforceable, the dispute instead shall be arbitrated.) In addition, you may bring any issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. (c) These Terms evidence a transaction in

interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of these Terms.

## 14.2. Pre-Arbitration Notice of Dispute and Informal Settlement Conference.

a) A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute (**"Notice"**). The Notice to Turn should be sent to Turn electronically at [support@turn.ai](mailto:support@turn.ai) (**"Notice Email Address"**). The Notice must include, at minimum: (1) your name, mailing address, telephone number at which you can be reached, and e-mail address (if any); (2) any unique identifier Turn provided; (3) a description of the nature and basis of the claim or dispute; (4) an explanation of the specific relief sought; (5) your signature; and (6) if you have retained an attorney, your signed statement authorizing Turn to disclose your confidential account records to your attorney if necessary in resolving your claim. A Notice is not complete until all of the information required by (1)-(6) has been received by the other party (**"Notice Completion Date"**). (b) After the Notice Completion Date, either party may request a conference within 60 days to discuss informal resolution of the dispute (**"Informal Settlement Conference"**). If timely requested, the Informal Settlement Conference will take place at a mutually agreeable time by telephone or videoconference. You and a Turn representative must both personally participate in a good-faith effort to settle the dispute without the need to proceed with arbitration. Any counsel representing you or Turn also may participate. The requirement of personal participation in an Informal Settlement Conference may be waived only if both you and Turn agree in writing. (c) Any applicable statute of limitations will be tolled during the **"Informal Resolution Period"**, which is defined as the period between the Notice Completion Date and the later of

(i) 60 days after the Notice Completion Date; or (ii) if an Informal Settlement Conference is timely requested, 30 days after completion of the Informal Settlement Conference.

## 14.3. Commencing Arbitration

An arbitration may be commenced only if you and Turn do not reach an agreement to resolve the claim during the Informal Resolution Period. A court will have the power to enforce this Section 14.3, including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice and participating in a timely requested Informal Settlement Conference. Unless prohibited by applicable law, the arbitration administrator shall not accept or administer any arbitration or assess any arbitration fees unless the claimant has complied with the Notice and Informal Settlement Conference requirements of Section 14.2.

## 14.4. Arbitration Procedure

(a) The arbitration will be governed by the Consumer Arbitration Rules (**"AAA Rules"**) of the American Arbitration Association (**"AAA"**), as modified by the terms of these Terms, and will be administered by the AAA. (If the AAA is not available or unwilling to administer arbitrations consistent with this arbitration agreement, another arbitration administrator shall be selected by the parties or, if the parties cannot agree on a provider, by the court.) The AAA Rules and fee information is available from the AAA online at http://www.adr.org. (b) The arbitrator shall be a lawyer with at least 10 years' experience or a retired judge. The arbitrator is bound by the terms of this arbitration agreement. All issues are for the arbitrator to decide, except that a court must decide issues relating to whether claims can or must be arbitrated, as well as other issues that this arbitration agreement specifies that a court shall decide. The arbitrator may consider rulings in other

arbitrations involving other claimants, but an arbitrator's ruling will not be binding in proceedings involving different claimants. If your claim is for $25,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator or through a telephonic, videoconference, or an in-person hearing as established by the AAA Rules. If your claim exceeds $25,000, the right to a hearing will be determined by the AAA Rules. Unless you and Turn agree otherwise, any in-person hearings will take place at a location that the AAA selects in the state of your primary residence. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as specified in Section 14.7 below, the arbitrator can award the same damages and relief that a court can award under applicable law.

## 14.5. Arbitration Fees

If Turn initiates arbitration, Turn will pay all AAA filing, administration, case-management, hearing, and arbitrator fees. If you wish to initiate arbitration, the AAA will govern the payment of these fees unless applicable law requires a different allocation of fees in order for this arbitration agreement to be enforceable. If you are unable to pay your share of the AAA fees, Turn will consider a request to pay them on your behalf, so long as you have fully complied with the requirements in Sections 14.2, 14.3, and 14.8 for any arbitration you initiated.

## 14.6. Alternative Payment

If you fully complied with the requirements Sections 14.2, 14.3, and 14.8 and the arbitrator issues an award in your favor that is greater than the value of Turn's last written settlement offer made before an arbitrator was selected (or awards you any relief if Turn did not make you a settlement offer), then

Turn will pay you $2,500 in lieu of any smaller award (the **"Alternative Payment"**). The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of attorneys' fees, expenses, and the Alternative Payment at any time during the proceeding and upon request from either party made within 14 days of the arbitrators' ruling on the merits. In assessing whether you are entitled to the Alternative Payment, the arbitrator shall not consider amounts offered for or awarded in attorneys' fees or costs.

## 14.7. Requirement of Individual Arbitration

You and Turn agree to seek, and further agree that the arbitrator may award, only such relief, whether relief in the form of damages, an injunction, or other non-monetary relief as is necessary to resolve any individual injury that either you or Turn have suffered or may suffer. In particular, if either you or Turn seeks any nonmonetary relief, including injunctive or declaratory relief, the arbitrator may award relief on an individual basis only, and may not award relief that affects individuals or entities other than you or Turn. YOU AND TURN AGREE THAT WE EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. FURTHERMORE, UNLESS BOTH YOU AND TURN AGREE OTHERWISE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. If, after exhaustion of all appeals, any of these prohibitions on non-individualized relief; class, representative, and private attorney general claims; and consolidation is found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then

the parties agree that such claim or request for relief shall be decided by a court after all other claims and requests for relief are arbitrated.

## 14.8. Mass Filings

If 25 or more claimants submit Notices raising similar claims and are represented by the same or coordinated counsel, all of the cases must be resolved in arbitration in stages using staged bellwether proceedings if they are not resolved prior to arbitration as set forth above in Section 14.2. The parties agree that the individual resolution of claims in arbitration might be delayed if the claims are pursued in connection with 25 or more similar claims. In the first stage, the parties shall each select up to 10 cases per side (20 cases total) to be filed in arbitration and resolved individually in accordance with this arbitration agreement, with each case assigned to a separate arbitrator. In the meantime, no other cases may be filed in arbitration, and the AAA or other arbitration administrator shall not accept, administer, nor demand payment for AAA fees or other fees for arbitrations commenced in violation of this Section. If the parties are unable to resolve the remaining cases after the conclusion of the first stage of bellwether proceedings, each side may select up to another 10 cases per side (20 cases total) to be filed in arbitration and resolved individually in accordance with this arbitration agreement, with each case assigned to a separate arbitrator. During this second stage, no other cases may be filed in arbitration, and the AAA or other arbitration administrator shall not accept, administer, nor demand payment for AAA fees or other fees for arbitrations commenced in violation of this Section. This process of staged bellwether proceedings shall continue until the parties are able to resolve all of the claims, either through settlement or arbitration. If these mass filing procedures apply to a claimant's Notice, any statute of limitations applicable to the claims set forth in that Notice will be tolled from the time the first

cases are selected for a bellwether proceeding until the claimant's Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved. A court will have the authority to enforce this Section, and, if necessary, to enjoin the filing or prosecution of arbitrations or the assessment or collection of AAA fees or other fees.

## 14.9. Future Changes to Arbitration Agreement

Notwithstanding any provision in these Terms to the contrary, you and Turn agree that if Turn makes any change to this arbitration provision during the period of time that you are receiving the Services or using the Sites (other than a change to the Notice Email Address), you may reject that change by providing Turn with written notice within 30 days of the change to the Notice Address and require Turn to adhere to the language in this arbitration agreement. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this arbitration agreement.

## 14.10. Opting Out of Arbitration

You may reject this arbitration agreement by sending an opt-out notice to the Notice Email Address (**"Opt-Out Notice"**). To be valid, an Opt-Out Notice must include: (1) your name, mailing address, telephone number at which you can be reached, and e-mail address (if any); (2) any unique identifier Turn provided; (3) a statement that you are opting out of this arbitration agreement, and Turn must receive the Opt-Out Notice within 30 days after the first day you used the Services or the Sites. If your Opt-Out Notice meets these requirements, this arbitration agreement will not apply to you. Rejecting this arbitration agreement will not affect your or Turn's rights or responsibilities under any other agreement. Nor will rejecting this arbitration agreement affect any prior arbitration agreement between you

and Turn.

## 14.11. Miscellaneous

Except as specified in Section 14.7, if any provision of this arbitration agreement is determined to be unenforceable, that provision should be severed and the rest of this arbitration agreement shall be enforced. This arbitration agreement is the complete agreement between you and Turn regarding the arbitration of disputes. If you do not opt out under Section 14.10, this arbitration agreement supersedes any prior or contemporaneous oral or written understandings on the subject except for claims covered by a prior arbitration agreement that are part of pending litigation or arbitration. Finally, you or Turn may recover attorneys' fees and other expenses from the other party if you or Turn file a lawsuit in court and the non-filing party must file a motion to compel or other papers to enforce this arbitration agreement.

# 15. General Terms

# 15.1. Governing law

These Terms shall be governed by the laws of the State of Illinois, without giving effect to any laws, rules or provisions of Illinois that would cause the application of the laws, rules or provisions of any jurisdiction other than Illinois. This Section is only intended to specify the use of Illinois law to interpret these Terms and it does not create any other substantive right to non-Illinoisans to assert claims under Illinois law whether by statute, common law, or otherwise.

## 15.2. Assignment

You will not assign, delegate, or otherwise transfer these Terms. Any attempt

by you to assign, delegate, or transfer these Terms will be null and void. We may assign, delegate, or otherwise transfer these Terms, in whole or in part, without your consent. Subject to this Section, these Terms will be binding on each Party and each Party's successors and assigns.

## 15.3. Severability

If any provision of these Terms is held by a court or other tribunal of competent jurisdiction to be unenforceable, that provision will be limited or eliminated to the minimum extent necessary to make it enforceable and, in any event, the rest of these Terms will continue in full force and effect.

## 15.4. Waiver

No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.

## 15.5. Cumulative Remedies

All remedies provided for in these Terms are cumulative and in addition to any other rights and remedies available to either party at law, in equity or otherwise.

## 15.6. Changes to the Services and Sites

We reserve the right, at any time and in our sole discretion, to amend, modify, suspend, or terminate the Services and the Sites, and any part thereof without notice to you. Turn shall have no liability to you or any other person or entity for any modification, suspension, termination, or loss of information.

## 15.7. Term, Suspension and Termination

(a) These Terms will remain in full force and effect while you use the Services or Sites. You may terminate your use of the Services or Sites at any time. (b) Turn may terminate, suspend or limit Your access to or use of the Services or Sites at any time if: (i) You violate these Terms; (ii) in the sole discretion of Turn, such action is necessary to prevent material errors or harm, or to limit Turn's liability; or (iii) You attempt to access or use the Services or Sites in an unauthorized or unlawful manner. (c) Any provisions of these Terms that would, by their nature, survive the termination or expiration of these Terms shall so survive.

## 15.8. Headings

The headings of the sections contained in these Terms are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of the Terms.

## 15.9. Entire Agreement

Except as provided in these Terms or other terms incorporated by reference into these Terms, these Terms supersede all prior and contemporaneous proposals, statements, sales materials, presentations, or agreements, oral and written. No oral or written information or advice given by us, our agents, or our employees will create a warranty or in any way increase the scope of the warranties or obligations under these Terms.

## 15.10. Notification

(a) By entering into and accepting these Terms, you agree and consent to receive electronically all communications, agreements, notices, documents

and disclosures relating to these Terms and your use of the Services or Sites (collectively, **"Communications"**) as permitted by the Electronic Signatures in Global and National Commerce Act, 15 USC §7001, et seq. (**"E-SIGN Act"**) and the Uniform Electronic Transactions Act. Communications include agreements and policies you agree to (for example, and not by way of limitation, these Terms, including the Privacy Policy), including updates to these agreements or policies; annual disclosures; transaction receipts or confirmations; statements and transaction history; and any other transaction information or other information related to the Services or Sites. You have the right to withdraw your consent at any time. To withdraw consent, you may send a written request by certified mail, postage prepaid and return receipt requested, to Turn at 20 515 N. State Street 14th Floor, Chicago, IL 60654. If consent is withdrawn, Turn reserves the right to discontinue your access to the Services or Sites, terminate any and all agreements with you, and/or charge you additional fees for paper copies. (b) Notices to us under these Terms will be provided via email to support@turn.ai.

## 15.11. Turn Equality Policy

Whether you're a woman, a veteran, a person of color, a member of the LGBTQ+ community, a dog person, a cat person, none of the above, or all of the above, Turn welcomes you as you and celebrates our collective diversity. Turn works to serve the underserved, and we are built on the strength of our collective community. Stated more formally but no less meaningfully: Turn prohibits treating individuals who use the Services or Sites (to accept on-demand work and perform them) differently based on their race, color, religion, national origin, age, sex, marital status, ancestry, physical or mental disability, veteran status, sexual orientation, gender identity or any other protected status under all applicable laws, regulations, and ordinances. Prohibited mistreatment includes refusing to perform and refusing to allow

an individual to perform a job based on any of the above characteristics as well as any other conduct that improperly takes into account any of these characteristics. Any Worker who believes they have been mistreated in violation of this policy should report their concerns to Turn at support@turn.ai. Violation of this policy can lead to termination of access to the Services and/or the Sites.

## 15.12. Force Majeure

Neither you nor Turn shall be liable or responsible to the other, nor be deemed to have defaulted under or breached these Terms, for any failure or delay in fulfilling or performing any term of these Terms, when and to the extent such failure or delay is caused by or results from a Force Majeure Event. **" Force Majeure Event"** means acts beyond the affected Party's reasonable control, including acts of God; flood, fire, earthquake or explosion; war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; actions, embargoes or blockades in effect on or after the date of these Terms; action by any governmental authority; global health pandemic; and national or regional emergency.

# 16. Additional Terms

To the extent you provide services to Partners in the following states, you also agree to the terms set forth in the following states:

## 16.1. Arizona

To avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Arizona. You acknowledge and agree that you are a **"qualified marketplace contractor"** and that Turn is a **"qualified marketplace platform"**, as defined in Arizona Revised Statutes Title 23.

Labor § 23-1603 (Qualified marketplace contractors) ("§23-1603"). By utilizing the Sites or the Services, you certify that you have acknowledged and understand that §23-1603 states the following and that you have acknowledged and agree to all points: You shall be treated as an independent contractor for all purposes under state and local laws, regulations and ordinances, including employment security laws prescribed in chapter 4 of Arizona Revised Statutes Title 23 and workers' compensation laws prescribed in chapter 6 of Arizona Revised Statutes Title 23, and that all of the following apply: All or substantially all of the payment for the services performed by you is related to the performance of services or other output. The services performed by you are governed by a written contract executed between you and Partner. The written contract referenced in the above paragraph provides for and you specifically acknowledge and agree to all of the following: That you are providing services as an independent contractor and not as an employee. That all or substantially all of the payment paid to you shall be based on the performance of services or other output. That you are allowed to work any hours or schedules you choose. If you elect to work specified hours or schedules, a contract may require you to perform work during the selected hours or schedules. That Turn does not restrict your ability to perform services for other parties. That you bear all or substantially all of your own expenses that are incurred by you in performing the services. That you are responsible for the taxes on your own income. That the contract and the association created by the contract may be terminated without cause by either party to the contract at any time on reasonable notice given to the other party.

## 16.2. Florida

To avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Florida. You acknowledge and agree that

you are a **"marketplace contractor"** and that Turn is a **"marketplace platform"**, as defined in Florida Title XXXI. Labor Chapter §451 (Marketplace Contractors). By utilizing the Sites or the Services, you certify that you have acknowledged and agree to all the following points: You have entered into an agreement with Turn to use its technology application to connect with third-party individuals or entities seeking temporary services. In return for compensation, you offer or provide temporary services to third-party individuals or entities through Turn's technology application. Turn offers an online-enabled technology application service, website, or system that enables you to provide services to third-party individuals or entities seeking such temporary services. Turn accepts service requests from the public only through its online-enabled technology application service, website, or system. Turn treats you as an independent contractor, and not as an employee of Turn for all purposes under state (Florida) and local laws, regulations, and ordinances. Turn does not unilaterally prescribe specific hours during which you must be available to accept service requests submitted through the platform from third-party individuals or entities. Turn does not prohibit you from using the technology application offered by other marketplace platforms. Turn does not restrict you from engaging in any other occupation or business. Turn and you agree that you are an independent contractor with respect to Turn. You bear all or substantially all of your expenses incurred by you in performing the services. You are responsible for paying taxes on your income.

## 16.3. Indiana

In order to avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Indiana. You acknowledge and agree that you are a **"marketplace contractor"** and that Turn is a **"marketplace platform"**, as defined in Indiana Title 22 Labor and Safety

§22-1-6 (Marketplace Contractors). By utilizing the Sites or the Services, you certify that you have acknowledged and agree to all of the following points: That you have entered into a written agreement with Turn to provide services to third party individuals or entities seeking those services. That all or substantially all of the payment for the services performed by you is related to the performance of services or other output. You are providing services as an independent contractor and not as an employee of Turn. You may work any hours or schedules you choose. However, if you do elect to work specified hours or schedules, you may be required to work during the specified hours or schedules that you elected to work. You may perform services for other parties without restriction. You bear responsibility for all or substantially all of the expenses that you pay or incur in performing the services, without the right to obtain reimbursement from Turn for the expenses. That Turn: operates an Internet web site or smartphone application that facilitates the provision of services by you to individuals or entities seeking the services; accepts service requests from the public only through its internet web site or smartphone application and does not accept service requests by telephone, facsimile, or in person at any retail location; and does not perform services at or from a physical location in Indiana.

## 16.4. Iowa

To avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Iowa. You acknowledge and agree that you are a **"marketplace contractor"** and that Turn is a **"marketplace platform"**, in accordance with Iowa Title III Public Services and Regulation §93.2 (Marketplace contractors as independent contractors-retroactivity) and for all purposes under Iowa state or local law. You agree: you are engaged as an independent contractor and not an employee of Turn. Turn does not unilaterally prescribe specific hours during which you must be

available to accept service requests submitted through Turn's digital network. Turn does not prohibit you from engaging in outside employment or performing services through other marketplace platforms. You bear your own expenses incurred in performing services. When providing services that require an Iowa license, you shall be responsible for obtaining the Iowa license and making such license available to the individuals or entities for whom you are providing services.

## 16.5. Kentucky

To avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Kentucky. You acknowledge and agree that you are a **"marketplace contractor"** and that Turn is a **"marketplace platform"**, as defined in Kentucky Revised Statutes KRS 336.137. By utilizing the Sites or the Services, you certify that you acknowledge, and agree to all of the following: You have entered into an agreement with Turn to use its digital network or mobile application to receive connections to third-party individuals or entities seeking services; and Turn offers a digital network or mobile application that connects you and other marketplace contractors to third-party individuals or entities seeking the type of services offered by a marketplace contractor; Turn accepts service requests from the public exclusively through its digital network or mobile application and does not accept service requests by telephone, facsimile, or in person at a physical retail location; You do not perform the services you offer at or from a physical business location that is operated by Turn in the state of Kentucky; You agree that you are an independent contractor with respect to Turn; Turn does not unilaterally prescribe specific hours during which you must be available to accept service requests from third-party individuals or entities submitted solely through the online-enabled application, software, Web site, or system of Turn; Turn does not prohibit you from using any

online-enabled application, software, Web site, or system offered by another marketplace platform; Turn does not restrict you from engaging in another occupation or business; You bear all or substantially all of the expenses incurred by you in performing the services; and Turn does not supply instrumentalities or tools for the person doing the work.

## 16.6. Tennessee

To avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Tennessee. You acknowledge and agree that you are a **"marketplace contractor"** and that Turn is a **"marketplace platform"**, in accordance with T.C.A.50-8-102. By utilizing the Sites or the Services, you certify that you acknowledge, and agree to all of the following: You are an individual, corporation, partnership, sole proprietorship, or other business entity that: have agreed with Turn to use Turn's online-enabled application, software, website, or system to receive connections to third-party individuals or entities seeking services in this state; and in return for compensation from the third-party or Turn, you offer or provide services to the third-party individuals or entities upon being given an assignment or connection through the marketplace platform's online- enabled application, software, website, or system; and Turn: offers an online-enabled application, software, website, or system that enables the provision of services by you and other marketplace contractors to third-party individuals or entities seeking services; and neither directly nor through any related party derives any benefit from work performed by marketplace contractors other than a subscription or use fee for placing marketplace contractors in assignments or otherwise providing connections. You are an independent contractor with respect to Turn; Turn does not unilaterally prescribe specific hours during which you must be available to accept service requests from third- party individuals or entities. Turn does not prohibit you from using any online-

enabled application, software, website, or system offered by other marketplace platforms; You may, at your discretion, enlist the help of an assistant to complete the services, and Turn may require the assistant to complete any standard registration and vetting process. If you enlist the help of an assistant, you, not Turn, is responsible for paying the assistant; Turn does not restrict you from engaging in any other occupation or business; Turn does not require you or other marketplace contractors to use specific supplies or equipment; Turn does not control the means and methods for the services performed by you by requiring you to follow specified instructions governing how to perform the services. However, Turn may require that the quality of the services provided by you meet specific standards and requirements; The agreement between you and Turn may be terminated by either you or Turn with or without cause; Turn provides no medical or other insurance benefits to you, and you are responsible for paying taxes on all income derived as a result of services performed to third parties from the assignments or connections received from Turn; and All, or substantially all, payment to you is based on performance of services to third parties who have connected with you through Turn.

## 16.7. Texas

To avoid any ambiguity, this Section specifically applies to you if you provide services to Partners in the state of Texas. You acknowledge and agree that you are a **"marketplace contractor"**, and Turn is a **"marketplace platform"** as defined in Texas Title 40 Social Services and Assistance §815.134. You specifically acknowledge and agree that: Turn uses a digital network to connect marketplace contractors to the public (including third-party individuals and entities) seeking the type of service or services offered by you and other marketplace contractors. Turn accepts service requests from the public (including third-party individuals and entities) only through

its digital network, and does not accept service requests by telephone, by facsimile, or in person at physical retail locations; Turn does not perform the services offered by you or other marketplace contractors at or from a physical business location that is operated by the platform in the state; You agree to use Turn's digital network to provide services to the public (including third-party individuals or entities) seeking the type of service or services offered by you and other marketplace contractors. All or substantially all of the payment paid to you shall be on a per-job or transaction basis; Turn does not unilaterally prescribe specific hours during which you must be available to accept service requests from the public (including third-party individuals or entities) submitted through Turn's digital network; Turn does not prohibit you from using a digital network offered by any other marketplace platform; Turn does not restrict you from engaging in any other occupation or business; You are free from control by Turn as to where and when you work and when you access Turn's digital network; You bear all or substantially all of your own expenses that are incurred by you in performing the service or services; You are responsible for providing the necessary tools, materials, and equipment to perform the service or services; Turn does not control the details or methods for the services performed by you by requiring you to follow specified instructions governing how to perform the services; and Turn does not require you to attend mandatory meetings or mandatory training. YOU ACKNOWLEDGE THAT YOU HAVE READ THESE TERMS, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.

# EXHIBIT 4



Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
United States of America

T: +1 312 782 0600
F: +1 312 701 7711

mayerbrown.com

**Charles E. Harris II**
Partner
T: +1 312 701 8934
F: +1 312 706 8359
CHarris@mayerbrown.com

July 13, 2023

<u>**VIA EMAIL**</u>

Antranig Garibian, Esq.
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, Delaware 19803
Tel: +1 302 772 6885
ag@garibanlaw.com

Re: *Doe v. First Advantage Background Services Corp., et al.*,
    Case No. 23-cv-00647 (D. Del. filed June 13, 2023)

Dear Mr. Garibian,

We are writing on behalf of Turn Technologies, Inc. ("Turn") to kindly demand that you dismiss the above-referenced lawsuit you filed for "John Doe," who we suspect to be Harry Samuel Smith. As discussed below, Mr. Smith's claims belong in arbitration if the parties cannot resolve his dispute through an informal settlement conference.

As shown in the attached certifications, Mr. Smith agreed to Turn's Terms of Use (the "Terms") when he applied to be an independent contractor for GoShare Inc. and authorized Turn to prepare a background report. The Terms attached to this letter emphasize: "PLEASE READ THESE TERMS OF USE CAREFULLY, INCLUDING THE AGREEMENT TO ARBITRATE …, AS THEY AFFECT YOUR LEGAL RIGHTS."

The agreement to arbitrate describes the arbitration process and specifies that "You and Turn agree to arbitrate all disputes and claims between us that arise out of, relate to, or are associated with the Services," such as "worker screening." The agreement includes "all claims arising out of or relating to any aspect of our relationship, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory, that arose either before or during this or any prior agreement, or that may arise after termination of these Terms." The claims Mr. Smith asserts in his lawsuit under sections 1681e(b) and 1681i of the Fair Credit Reporting Act fall squarely within the scope of this broad arbitration agreement. While Mr. Smith could have opted out of the arbitration agreement if he did not want to be bound by it, he failed to do so.

You should also be aware that, before filing any arbitration, Mr. Smith must first send Turn a Notice of Dispute, after which each party "may request a conference within 60 days to discuss informal resolution of the dispute." Such a conference may be particularly valuable here as you appear to be operating from misinformation. For instance, Turn did a thorough reinvestigation of Mr. Smith's dispute and found, after reviewing the New Castle County Court records that the

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership) and Tauil & Chequer Advogados (a Brazilian partnership).

Mayer Brown LLP

April 19, 2023
Page 2

criminal charges Mr. Smith had expunged were for a different case than the cases giving rise to the criminal charges on his background report

In sum, you must voluntarily dismiss the lawsuit at hand. If Turn must instead enforce its rights through a motion to compel, it will seek attorneys' fees and costs as expressly permitted under the agreement to arbitrate: "Turn may recover attorneys' fees and other expenses from the other party if you or Turn file a lawsuit in court and the non-filing party must file a motion to compel or other papers to enforce this arbitration agreement."

These sorts of disputes, where any damages are no doubt *de minimis*, are perfect for the informal dispute resolution process Mr. Smith agreed to engage in under the agreement to arbitrate. We encourage you to take advantage of the procedures if you choose to pursue his claims. Please let us know by **July 19, 2023**, whether you will dismiss the lawsuit against Turn.

Best regards,

Charles E. Harris, II
Partner

Enclosures

# EXHIBIT 5

**Turn Technologies, Inc.**
turn.ai | support@turn.ai

# Welcome

GoShare (the "Company") has engaged Turn Technologies, Inc. to obtain a consumer report and/or investigative consumer report as a pre-condition of your engagement with the Company. Turn Technologies Inc. will conduct a background check in compliance with applicable law.

| Harry | Samuel | Smith |
|---|---|---|
| First Name | Middle Name | Last Name |

| ███████ | - | ███████ |
|---|---|---|
| Date of Birth | Gender | Social Security Number |

| 19701 | harryssmith76@yahoo.com | 13026852042 |
|---|---|---|
| Zip Code | Email | Phone Number |



Harry Samuel Smith

Signature

☑ I certify that this is me, and that the information provided in the present fields is true, valid, accurate, and complete. By proceeding further you agree to Turn Technologies Terms of Use and Privacy Policy

---

 **Signature Metadata**

Timestamp: *2023-03-24 17:09:40.935174*

**CONFIDENTIAL**                                                                                   **TT00007**

**Turn Technologies, Inc.**
turn.ai | support@turn.ai

# Authorization of Background Investigation

I acknowledge receipt of the separate document entitled DISCLOSURE REGARDING BACKGROUND INVESTIGATION and A SUMMARY OF YOUR RIGHTS UNDER THE FAIR CREDIT REPORTING ACT and certify that I have read and understand both of those documents. I hereby authorize the obtaining of "consumer reports" and/or "investigative consumer reports" by GoShare ("Company") at any time after receipt of this authorization and throughout the performance of services. To this end, I hereby authorize, without reservation, any law enforcement agency, administrator, state or federal agency, institution, school or university (public or private), information service bureau, Company, or insurance company to furnish any and all background information requested by **Turn Technologies, Inc., 515 N. State Street, 14th Floor, Chicago, IL 60654; Tel. # 1.888.499.TURN (8876)**; www.turn.ai and/or Company. I agree that a facsimile ("fax"), electronic or photographic copy of this Authorization shall be as valid as the original.

☑ By clicking this checkbox, I indicate my agreement to all of the above.

**CONFIDENTIAL**                                                          **TT00014**

# EXHIBIT 6



**Turn Technologies Inc.**
📍 515 N. State Street, 14th
Floor, Chicago, IL, 60654
✉ support@turn.ai  📞 1.888.499
TURN

# Harry Samuel Smith   ● **Ready**

# GoShare

600 W Broadway, Suite 700,
San Diego, CA, 92101

Requested on: 3/24/2023        Signed up on: 3/24/2023        Completed on: 5/22/2023

## 👤 Candidate Information   Download Report

| Full Legal Name | DOB | Turn ID |
|---|---|---|
| Harry Samuel Smith | ██████ | C4063020280 |

| Driver Licence Number | SSN | Location |
|---|---|---|
| 1087117 | ██████ | 122 Brandywine Dr Bear DE 19701 |

| Phone Number | Email |
|---|---|
| 1 (302) 685-2042 | harryssmith76@yahoo.com |

## 📋 Report Summary

✅ **SSN Trace**

✅ **Addresses**

✅ **Sex Offender Check**                               **Clear**

⚠️ **Criminal Records**                                                          **Hit**

✅ **MVR**                                                                        **Clear**

✅ **Watchlist**                                                                  **Clear**

## 📋 Report Detail

✅ **SSN Trace**

**DOB**

**Mortality**
Not Deceased
**Current Address**

| | | | |
|---|---|---|---|
| 122 Brandywine Dr | Bear | DE | 19701 |

✅ **Sex Offender Check**                                                         **Clear**

⚠️ **Criminal Records**                                                          **Hit**

✅ **WV-Mercer**    Clear

⚠️ **DE-New castle**    Hit

| Offense Description | Plea | Crime Type | Source |
|---|---|---|---|
| AGGRESSIVE DRIVING | No plea entered | Misdemeanor | Undefined |

| Offense Day | State | Disposition | Disposition Date |
|---|---|---|---|
| Not provided | DE | GUILTY | 11-19-2007 |

| Charges Filed Date | | Sentence | |
|---|---|---|---|
| Not provided | | Not provided | |

| Offense Description | Plea | Crime Type | Source |
|---|---|---|---|
| POSSESS DRUGS WITHIN 1000 FEET OF SCHOOL | No plea entered | Felony | Undefined |

| Offense Day | State | Disposition | Disposition Date |
|---|---|---|---|
| Not provided | DE | GUILTY | 11-19-2007 |

| Charges Filed Date | | Sentence | |
|---|---|---|---|
| Not provided | | Not provided | |

| Offense Description | Plea | Crime Type | Source |
|---|---|---|---|
| POSSESS DRUGS WITHIN 1000 FEET OF SCHOOL | No plea entered | Felony | Undefined |

| Offense Day | State | Disposition | Disposition Date |
|---|---|---|---|
| Not provided | DE | GUILTY | 11-19-2007 |

| Charges Filed Date | | Sentence | |
|---|---|---|---|
| Not provided | | Not provided | |

| Offense Description | Plea | Crime Type | Source |
|---|---|---|---|
| CONSPIRACY 2ND DEGREE | No plea entered | Felony | Undefined |

| Offense Day | State | Disposition | Disposition Date |
|---|---|---|---|
| Not provided | DE | GUILTY | 04-10-2012 |

| Charges Filed Date | | Sentence | |
|---|---|---|---|
| Not provided | | Not provided | |

| Offense Description | Plea | Crime Type | Source |
|---|---|---|---|
| MAINTAIN DWELLING - DRUGS | No plea entered | Felony | Undefined |

| Offense Day | State | Disposition | Disposition Date |
|---|---|---|---|
| Not provided | DE | GUILTY | 04-10-2012 |

| Charges Filed Date | | Sentence | |
|---|---|---|---|
| Not provided | | Not provided | |

| Offense Description | Plea | Crime Type | Source |
|---|---|---|---|
| FAIL TO SIGNAL | No plea entered | Violation | Undefined |

| Offense Day | State | Disposition | Disposition Date |
|---|---|---|---|
| Not provided | DE | GUILTY | 10-07-2014 |

| Charges Filed Date | | Sentence | |
|---|---|---|---|
| Not provided | | Not provided | |

✓ **Motor Vehicle Record**                                        **Clear**

**COMMERCIAL**

| Expiration Date | First Name | Issued Date | Last Name |
|---|---|---|---|
| 2027-12-13 | HARRY | 2023-02-28 | SMITH |

| License Class | Middle Name | Statuses | Total State Points |
|---|---|---|---|
| CLASS A COMMERCIAL VEH ANY WEIGHT. MAY TOW ANOTHER VEHICLE > 10K LBS. | SAMUEL | VALID | 0 |

| Type |
|---|
| COMMERCIAL |

## PERSONAL

| Expiration Date | First Name | Is Valid | Issued Date |
|---|---|---|---|
| 2027-12-13 | HARRY | | 2023-02-28 |

| Last Name | License Class | Middle Name | Original Issued Date |
|---|---|---|---|
| SMITH | CLASS D NON-COMMERCIAL ANY NON COMMERCIAL VEHICLE | SAMUEL | 1/15/1993 |

| Statuses | Total State Points | Type |
|---|---|---|
| VALID | 0 | PERSONAL |

## Violations

CLEAR

## Accidents

CLEAR

**Actions**

CLEAR

✓ **Watchlist**                                                                **Clear**